**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHERYL SPENCER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No: 09 C 7499 |
| v. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Cheryl Spencer, seeks review of the final decision of the
Commissioner ("Commissioner") of the Social Security Administration ("Agency")
denying her application for Disability Insurance Benefits ("DIB") under Title II of the
Social Security Act ("Act"). Ms. Spencer asks the court to reverse and remand the
Commissioner's decision.

## I.
## PROCEDURAL HISTORY

Ms. Spencer applied for DIB on March 20, 2006, alleging that she had become
disabled on April 1, 2005, due to the after-effects of a stroke, including forgetfulness and
difficulty concentrating. (Administrative Record ("R.") 111-13, 133). Her application
was denied initially and upon reconsideration. (R. 59-65, 67-70). Ms. Spencer continued
pursuit of her claim by filing a timely request for hearing. (R. 72).

An administrative law judge ("ALJ") convened a hearing on March 31, 2009, at
which Ms. Spencer, represented by counsel, appeared and testified. (R. 21-58). In
addition, Ed Pagello testified as a vocational expert. (R. 21, 48-56). On July 15, 2009,
the ALJ issued a decision finding that Ms. Spencer was not disabled because she retained

the capacity to perform jobs that exist in significant numbers in the national economy. (R. 9-19). This became the final decision of the Commissioner when the Appeals Council denied Ms. Spencer' request for review of the decision on October 2, 2009. (R. 1-3). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Spencer has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Ms. Spencer was born on February 5, 1959, making her fifty years old at the time of the ALJ's decision. (R. 154). She quit high school her junior year, but has a GED and completed one year of college. (R. 139). For fifteen years prior to her alleged onset of disability in April 2005, she worked as a social services director in a nursing home. It was essentially an administrative-type, desk job, although it did involve 2.5 hours of standing and walking each day. (R. 134).

### B.

### Medical Evidence

In June of 2004, Ms. Spencer suffered a cerebral vascular accident. She went to the local emergency room complaining of confusion; she had a facial droop, slurred speech, and mild weakness and unsteadiness on her feet. CT scan confirmed a right basal ganglia infarct. (R. 183). Ms. Spencer was hospitalized for testing and treatment for three days: June 27th to the 30th. (R. 183). She was discharged home in stable condition when she had been symptom-free for two days. (R. 183-262). She was a heavy smoker

(R. 184) and was advised to quit. (R. 183). Ms. Spencer began prescriptions for Sinemet (used to treat Parkinson's-like symptoms), Klonopin (for seizure control), Plavix (for prevention of strokes), Advicor (high cholesterol), and Claritin (antihistimine). (R. 183).

Ms. Spencer followed up with Dr. Matt Talarico. Early in her treatment, on July 12, 2004, she reported trouble with focus, concentration, and forgetfulness. (R. 291). There was also significant left extremity weakness. (R. 291). Ms. Spencer apparently had a history of sinus problems; she said tat had been pretty good. (R. 291). She had quit smoking. (R 291). On July 23, 2004, Dr. Talarico wrote to Ms. Spencer's employer and said she was showing steady improvement but still had equilibrium problems. (R. 289). She was actively participating in physical therapy and the doctor thought she would return to work shortly. (R. 291).

By September, overall, Ms. Spencer was doing better. (R. 287). She was still disorganized and was easily overwhelmed, but was working half-days. (R. 287). She had no problems driving. (R. 287). Her sinuses were good. (R. 287). In October, Dr. Talarico again reported she was "[d]oing better overall." (R. 286). She was having trouble multi-tasking, but was increasing to six-hour work days. (R. 286).

On November 23, 2004, Ms. Spencer reported that she had started smoking again. (R. 285). She was still doing well – she said she was "doing a little better all the time with 6hr days" – but, still, there was the problem with multi-tasking. (R. 285). She reported being fatigued and feeling "crummy" due to nasal congestion. (R. 285). In light of her history of stroke, she was again strongly advised to quit smoking. (R. 285). The doctor anticipated an increase to full days in the near future. (R. 285).

On December 20, 2004, Dr. Talarico reported that Ms. Spencer had pulled an abdominal muscle. (R. 283). This was apparently from coughing a lot. (R. 283). Through March of 2005, Ms. Spencer's complaints were confined to her sinus and coughing troubles. (R. 280-82). Other than that, she continued to do "better overall." (R. 282).

On that positive note, it appears Ms. Spencer left Dr. Talarico and was treating with Dr. Ushasri Koganti. Her treatment notes are a jumble of hand-written jottings in no particular order with many duplicates. (R. 326-427). In the main, they consist of treatment for sinus complaints and sore throats, and prescription refills. There is a mention of sadness and depression on March 1, 2007. (R. 363, 411). On March 22, 2007, Dr. Koganti reported that Ms. Spencer was making wedding plans and was feeling better. (R. 367). There does not appear to be any treatment for complaints stemming from Ms. Spencer's stroke – *i.e.*, memory loss or concentration difficulties.

On May 17, 2006, Dr. Koganti filled out a neurological disability report regarding her treatment of Ms. Spencer. She noted that there had been no motor, sensory, or reflex changes due to the stroke. (R. 306). There was some muscle fatigue after activity, reduction to either 3/5 or 4/5 – the doctor wrote one first and wrote over it with the other. (R. 306). There were no manipulation or dexterity problems. (R. 307). Mental state was normal. (R. 307). There was no indication of aphasia or difficulty communicating. (R. 307). Dr. Koganti said that Ms. Spencer had memory problems, difficulty concentrating, and was easily distracted. (R. 307). She would forget instructions. (R. 308). The doctor also said that she had not performed any psychological testing. (R. 308). In a second report that same day – a psychiatric report – the doctor wrote that Ms. Spencer

could remember five numbers out of five forward and backward. She could remember what she did the previous day and the route she took to the office. She remembered the past few presidents and her date of birth. She could name five large cities. She was able to subtract serial sevens from one hundred. (R. 311). She also wrote that her ability to talk was sometimes impaired. (R. 310). Dr. Koganti said that Ms. Spencer could not remember and carry out instructions or keep up with her work. (R. 312). She had taken a leave of absence because of this. (R. 309).

On March 2, 2007, Dr. Koganti wrote a letter in support of Ms. Spencer's claim for disability benefits. She said she had treated her since 2003. She indicated that Ms. Spencer was taking "Allegra, Cingular [sic], Sinimet, and Vytoren [sic]." (R. 365). The first three are for allergy and sinus problems, the fourth is for high cholesterol. Dr. Koganti said Ms. Spencer had not worked since April 2005, due to poor memory and dizziness from her allergies and medications. She limited her driving to short trips. The doctor said that, as a result of these two problems, Ms. Spencer was disabled and "[u]nemployable indefinitely." (R. 365).

Dr. Koganti wrote again at the end of the month that since her stroke, Ms. Spencer's memory had gotten worse. The doctor said she quit her job due to this, was not able to function in a job situation as a result, and that her memory loss was permanent. (R. 366).

On May 19, 2006, Ms. Spencer had a consultative psychological assessment with Mark Langgut in connection with her disability claim. Ms. Spencer complained of short-term memory loss and poor concentration. (R. 313). She said she had not smoked since her stroke. (R. 314). She said she was forgetful around the house and needed reminders.

(R. 314).   There were no signs of depression, but there was some anxiety of moderate intensity.   (R. 314).   During testing, Ms. Spencer exhibited intact memory skills.   (R. 314).   She remembered "seven digits forward and four backward, indicating intact immediate recall ability.   (R. 314).   Short term memory was also intact; Ms. Spencer recalled the weather and what she had for dinner the day before, and her route to the office.   (R. 314).   She identified the four previous presidents and could name five large cities.   (R. 315).   She was able to subtract serial threes from one hundred and her computation skills were quick and accurate.   (R. 315).   Her thought processes demonstrated average coherence and normal speed, flexibility, and suggestibility. (R. 315).

On June 3, 2006, Dr. Afiz Taiwo performed an internal medicine examination. Ms. Spencer again complained about her memory.  (R. 318).  Musculoskeletal exam was normal.  (R. 320).  Neurological exam was also normal.  Dr. Taiwo reported that Ms. Spencer's recent memory was poor, as she recalled just one of three items after a five minute interval.  (R. 320).

### C.
### The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

At the hearing, Ms. Spencer testified that she lived with her husband of two years, and that she had an adult son from her previous marriage.  (R. 26).  She said she stopped working at the nursing home in April 2005 because she was forgetting things and couldn't keep up with the work anymore.  (R. 29, 35).  Later, she explained that she was falling asleep during work.  (R. 37).  Her job involved doing living wills and no

resuscitate orders, patient assessments, charting, and care planning. (R. 29). Ms. Spencer said that she didn't do a lot during the day aside from watching TV. (R. 31). She also read magazines. (R. 32). Her husband helped a lot with housework and cooking. (R. 32). He did chores when he becomes impatient with how long she takes. (R. 32). He did most of the yard work, while she tended to a couple of small flower beds. (R. 33). Ms. Spencer continues to smoke a half-pack of cigarettes a day. (R. 33).

Ms. Spencer said she was afraid to work at another job like cashiering, because if there was a customer complaint, she wasn't sure she'd respond correctly. (R. 34). She also said she got fatigued, but wasn't sure that was from her stroke. (R. 34). She didn't think she could remember enough to perform any kind of job. (R. 35). She didn't mention any other problem affecting her ability to work, until her attorney specifically asked her about dizziness. (R. 35). Then she said she got dizzy four or five times a week, including the day of the hearing. (R. 35-36). Her head felt woozy and it would last an entire day. (R. 36). She said she wasn't able to do anything when she had it – her attorney characterized it as "incapacitated" for her – but she allowed that she was able to attend the hearing and testify. (R. 35, 37). She said she would also get disoriented and confused. (R. 38). She mistook someone else's car for hers once, sometimes forgot grocery lists at home, and would leave the stove burners on. (R. 40). She limited her driving to within her town. (R. 38). She said there was weakness in her hands; her husband opened bottles or jars for her. (R. 45).

## 2.
### Vocational Expert's Testimony

Ed Pagello then testified as a vocational expert. He classified Ms. Spencer's nursing home job as skilled, sedentary work. (R. 47-48). In response to the ALJ's hypothetical, the VE testified that if a person were limited to medium or light, unskilled work – due to memory and concentration problems – there would be wide variety of jobs she could perform. (R. 49). These would include hand packer and hand sorter at the light level, and bagger at the medium level. (R. 49). A further limitation entailing only occasional balancing and no concentrated exposure to heights or machinery – due to dizziness – would not change the job base. (R. 53). The person could still perform jobs like cashier or file clerk. (R. 54). Ms. Spencer's attorney asked the VE whether a person who took four unexcused days off per week would be able to hold down a job; the predictable answer was "no." (R. 50-51). The VE added that employers tolerate no more than one-and-three-quarters unexcused absences per month. (R. 51). Ms. Spencer's counsel then asked Ms. Spencer whether, on the best day ever, she could stand for eight hours; she said no. (R. 55). She said she would have to rest. (R. 55). He then asked the VE if any jobs would allow a person to rest for 30 minutes after every 30 minutes of work – essentially, work a half-day in a full-time job. (R. 55). Again, as predictably as before, the VE said, "no." (R. 55)

## D.
### The ALJ's Decision

The ALJ found that Ms. Spencer suffered from the following severe  impairment: "a history of cerebrovascular accident with ongoing residuals." (R. 11). She noted that a stroke in June 2004 had left Ms. Spencer with problems with concentration and memory,

as well as fatigue.  (R. 11).  She further found that this impairments did not meet or equal a listed impairment, specifically listing 11.04, covering central nervous system vascular accident, and listing 12.02, covering organic mental disorder.  (R. 17).

Next, after summarizing the evidence in the medical record and discussing Ms. Spencer's testimony, the ALJ determined that she could perform light work as long as it was unskilled and require no more than occasional balancing and no concentrated exposure to moving machinery or unprotected heights.  (R. 13).   Under the regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b); 416.967(b).  The ALJ  found that Ms. Spencer's "statements regarding the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (R. 14).  More specifically, the ALJ discussed how the medical evidence – like Dr. Koganti's treatment notes – did not fully support Ms. Spencer's allegations.  (R. 16-17).  The ALJ also rejected the opinion of Ms. Spencer's doctor that she was disabled due to memory loss and concentration difficulties, finding that this was not supported by his treatment records.  (R. 16).   She found that Ms. Spencer could not perform her past work but, relying on the VE's testimony, concluded that Ms. Spencer could perform jobs existing in significant numbers in the regional economy.  (R. 27-28).  As a result, she concluded that Ms. Spencer was not disabled.  (R. 28).

# IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010)(*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008). It is not for the court to reweigh the evidence or make credibility determinations *Peabody Coal Co. v. McCandless,* 255 F.3d 465, 469 (7th Cir. 2001). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, it is not abject; the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit

his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It is a "lax" standard, *Berger*, 516 F.3d at 544.

## B.
## The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;
>
> 2) does the plaintiff have a severe impairment;
>
> 3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
>
> 4) is the plaintiff unable to perform his past relevant work; and
>
> 5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden

shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

### C.
### Analysis

Ms. Spencer raises three points she feels require a remand of the ALJ's decision in this case. First, she complains that the ALJ improperly rejected the opinion of her treating physician that she was disabled. Second, she contends that the ALJ failed to make a proper credibility determination. Finally, Ms. Spencer argues that the ALJ provided no medical basis for her determination of her residual functional capacity ("RFC").

### 1.

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Schmidt*, 496 F.3d at 842; *White v. Barnhart,* 415 F.3d 654, 658 (7th Cir.2005). This rule takes into account the treating physician's advantage in having personally examined the claimant and developed a rapport, while controlling for the biases that a treating physician may develop, such as friendship with the patient. *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006)("many physicians (including those most likely to attract patients who are thinking of seeking disability benefits), . . . will often bend over backwards to assist a patient in obtaining benefits.")(parenthesis in original). *See also Kettelboater v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008)(ALJ can discount opinion of treating physician if "inconsistent with the consulting physician's

opinion, internally inconsistent, or based solely on the patient's subjective complaints...."); *Dixon,* 270 F.3d at 1177.

In short, the Seventh Circuit has "'disapproved any mechanical rule that the views of a treating physician prevail.'" *Peabody Coal Co. v. McCandless,* 255 F.3d 465, 469 (7th Cir.2001). The "'treating physician's views may not be accepted unless there is a good reason to believe that they are accurate.' .... Conversely, when the views of the treating physician are accurate and supported by medical evidence, those views may be accepted.'"*Zeigler Coal Co. v. Office of Workers' Compensation Programs,* 490 F.3d 609, 616 (7th 2007). *See also Dixon,* 270 F.3d at 1177 ("a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work")

The Seventh Circuit has expressed some puzzlement about the "treating physician" rule:

> Obviously if [the treating physician's medical opinion] is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it. Equally obviously, once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight.

*Hofslien*, 439 F.3d at 376. At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." *Id.* at 377. In deciding how much weight to accord a treating physician's opinion, the ALJ should consider various factors, like how often the treating physician examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, and so forth; consistency with the record and support are rolled back into the equation as well. *Id.* at 377; 20 C.F.R. § 404.1527(d). Simply put, if an ALJ does not give the treating

physician's opinion controlling weight, he has to provide "good reasons" for how much weight he accords it. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir.2007).

Here, the ALJ cited two reasons for rejecting Dr. Koganti's opinion, the principal one being that it was unsupported by Dr. Koganti's own treatment notes. That is a valid reason for according a treating physician's opinion little or no weight. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). Dr. Koganti treated Ms. Spencer for about six years. The relationship produced approximately one hundred pages of hand-written notes. There does not appear to be a single mention of memory problems in those notes; Ms. Spencer certainly does not point to any. Dizziness is mentioned perhaps twice in the six-year period: April 19, 2007, and July 25, 2008. (R. 369, 379); (*Plaintiff's Memorandum*, at 11). These actually predated Dr. Koganti's opinion dealing with dizziness. At the time of the opinion, there appears to have been no mention of dizziness by doctor or patient. As plaintiff must concede, the vast majority of her visits to Dr. Koganti dealt with sinus problems, whether from her allergies or her smoking. (*Plaintiff's Memorandum*, at 11). With no mention of memory problems during treatment, and just a couple of mentions of dizziness, Dr. Koganti's notes can certainly be said to provide essentially no support to his opinion that Ms. Spencer is disabled *due to memory trouble and dizziness* or to Ms. Spencer's claims in this regard.[1]

The ALJ also rejected Dr. Koganti's opinion because she appeared merely to accept Ms. Spencer's complaints uncritically. This, too, is an acceptable reason for

---

[1] The doctrine of impeachment by omission, *Moylan v. The Meadow Club, Inc.*, 979 F.2d 1246, 1249 (7th Cir. 1992), may properly be applied here.

discounting a treating source's opinion. *Ketelboeter*, 550 F.3d at 625; *Schmidt*, 496 F.3d at 842. In the six years of Dr. Koganti's course of treatment of Ms. Spencer, there is a single memory evaluation, related in her psychiatric report of May 17, 2006. Both recent and remote memory were intact. (R. 311). The results were the same when Dr. Langgut evaluated Ms. Spencer's memory on May 19, 2006: memory skills were intact. (R. 314-15). There is a single evaluation in the record where Ms. Spencer did not exhibit intact memory, that of Dr. Taiwo on June 3, 2006. It was up to the ALJ to weigh these evaluations and choose which ones to accept. *Schmidt*, 496 F.3d at 845. But clearly, given Dr. Koganti's evaluation of Ms. Spencer's memory, it was understandable that the ALJ felt that Dr. Koganti was basing her opinion on Ms. Spencer's allegations rather than medical tests.

Ms. Spencer says that, even allowing for all that, the ALJ should have contacted Dr. Koganti if the ALJ felt her opinion was unsupported by her treatment records. The same argument was rejected by the Seventh Circuit in *Simila*. While "[a]n ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable," *Barnett*, 381 F.3d at 669, that does not mean that an ALJ must do so whenever the evidence fails to support a doctor's opinion. *Simila*, 573 F.3d at 516. That is simply not the same as a situation where "the information already in the record is 'inadequate' to make a determination of disability." *Skinner v. Astrue,* 478 F.3d 836, 843 (7th Cir.2007). As in *Simila*, the record here "was not 'inadequate.' The ALJ simply found that this evidence failed to support Dr.[Koganti's] conclusions, a finding the regulations entitled her to make." *Simila*, 573 F.3d at 516 -17.

**2.**

Witnesses will lie when it is to their advantage, *Schmude v. Tricam Industries, Inc.*, 556 F.3d 624, 628 (7th Cir. 2009), and since an ALJ is in the best position to assess a witness's credibility, and a court must review that determination deferentially. *Castile v. Astrue*, – F.3d –, –, 2010 WL 3188930, *5 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). *Cf. Ashcraft v. State of Tennessee*, 322 U.S. 143, 171 (1944) (Jackson, J., dissenting)("a few minutes' observation of the parties in the courtroom is more informing than reams of cold record."). An ALJ's credibility determination should not be overturned unless the claimant can show it is "patently wrong." *Craft*, 539 F.3d at 678; *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir.2006). The ALJ must provide specific reasons for her credibility finding, such that the court can understand his reasoning. *Craft*, 539 F.3d at 678; *Arnold v. Barnhart,* 473 F.3d 816, 822 (7th Cir.2007), But the court can't "nitpick" the determination; it should only analyze it for fatal gaps or contradictions. *Castile*, – F.3d at –, 2010 WL 3188930, *5; *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

Ms. Spencer complains that the ALJ simply found her not credible in a conclusory statement, with a summary, but no analysis, of the evidence. But the ALJ did cite reasons for her credibility determination; she said the medical evidence did not support the extent of Ms. Spencer's allegations. (R. 16-17). Again, that's something the ALJ was free to conclude. Discrepancies between objective evidence and self-reports may suggest symptom exaggeration. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir.2005); *Powers v. Apfel,* 207 F.3d 431, 435-36 (7th Cir.2000). The medical evidence simply did not support the intensity of

memory loss and dizziness Ms. Spencer claimed to experience.  Memory loss of such a disabling degree ought to have come up in testing.  Crippling dizziness four or five days each week ought to have been mentioned repeatedly in a six-year medical history.  And if it's due to medications, one might expect repeated evaluations and changes in prescription regimen.  *See Schaaf*, 602 F.3d at 876 (no indication in the record that claimant complained of side effects to his doctors or inquired into changing  medication).  As already noted, Ms. Spencer can't cite to any such evidence in the record.

The ALJ also pointed to Ms. Spencer's activities and the fact that her list of things she forgets were things that anyone might forget.  These secondary points are not as strong as the ALJ's resort to the objective medical evidence, but they need not be.  On balance, if these are flaws in the ALJ's reasoning, they are not enough to undermine the ALJ's decision that Ms. Spencer was exaggerating her symptoms.  Not all of the ALJ's reasons must be valid "as long as [there is] some support in the record" for the ALJ's determination.  *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008); *Simila,* 573 F.3d at 518 (ALJ's credibility determination need not be "flawless," just not "patently wrong").  Here, the long medical history with Dr. Koganti, which focused almost entirely on sinus problems, along with objective tests from Dr. Koganti and Dr. Langgut, provide sufficient basis for the ALJ's credibility determination.

Ms. Spencer also submits that the ALJ improperly failed to credit her allegations that she was severely limited in her ability to lift.  Again, given the dearth of medical evidence demonstrating any limitation on Ms. Spencer's ability to lift – grasping, strength, and range of motion were normal (R. 320), Dr. Koganti said there was a small

fatigue of muscles with activity, but motor skills were normal (R. 306) – the ALJ's finding was perfectly rational. *Getch*, 539 F.3d at 483; *Sienkiewicz,* 409 F.3d at 804; *Powers,* 207 F.3d at 435-36; *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)(claimant failed to support claim where there was a dearth of evidence concerning alleged symptom).

**3.**

Finally, Ms. Spencer argues that the ALJ made her own independent medical judgment about what Ms. Spencer's RFC was. Basically, she restates her contentions that the ALJ improperly discredited her claim that she had unspecified exertional limitations in addition to her memory loss and dizziness. But the case she presented to the ALJ was all about memory loss and dizziness. She indicated the main reason she couldn't return to work was her memory problems. By the end of the hearing, however, her attorney had steered her to discussing her inability to do any physical activity for more than fifteen or thirty minutes without a similarly long period of rest.

The problem is, Ms. Spencer doesn't identify where this comes from. It is up to her to present medical evidence to support this claimed limitation. *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010); *Scheck,* 357 F.3d at 702. As already noted, and as the ALJ clearly explained, the medical evidence demonstrates she has no physical limitation aside from a small degree of muscle fatigue after activity. Dr. Koganti's finding of a 4 or even a 3 level of fatigue on a 0-5 scale with 0 being the most severe simply does not support such a claim. Not even Dr. Koganti suggested this was a factor in her opinion that Ms. Spencer was disabled. Moreover, the ALJ's thoroughly reviewed the medical record, and contrary to Ms. Spencer's contentions, the ALJ did not reject all the available medical

evidence upon which to base an RFC assessment. *Cf. Bailey v. Barnhart*, 473 F.Supp.2d 822, 839 (N.D.Ill. 2006). The ALJ explained that there was no evidence to support the degree of physical limitation, or fatigue, Ms. Spencer claimed to suffer.[2]

Where, then, is the evidence to suggest Ms. Spencer suffers the physical limitations she alleges? She doesn't refer to any. And the ALJ summarized all the medical evidence rather thoroughly. Even Dr. Koganti's most dire estimate regarding muscle fatigue does not suggest it is as debilitating as Ms. Spencer claims. Indeed, the degree of impairment she is claiming seems to have been an afterthought coming at the conclusion of her hearing.

### 4.

The medical evidence demonstrates that Ms. Spencer suffered a stroke which left her impaired. With treatment, however, she improved steadily – the primary physician responsible for her care following her stroke indicated that she was consistently improving and was destined for a full-time return to her former job. In fact, she was working six-hour days. But it turned out that she was unable to cope with the demands of what appears to have been a fairly responsible and complicated position at a local nursing home. The doctor she saw throughout this period treated her for sinus problems, There

---

[2] Ms. Spencer cites no controlling Seventh Circuit authority in support of her position in this regard. The district court cases that she instead relies upon are drawn from a line of authority following *Bauzo v. Bowen*, 803 F.2d 917 (7th Cir. 1986). There, the record included an "uncontradicted" medical opinion that the claimant could not sit for prolonged periods of time, yet the Commissioner determined she could. 803 F.2d at 926. Here, there is no such uncontradicted medical opinion regarding Ms. Spencer's physical capacity. Even Dr. Koganti's opinions – which were unsupported by her own treatment notes – make no mention of such an impairment. They are limited to memory loss in the main, and secondarily, mention dizziness. Moreover, in the case *Bauzo* relied upon, the ALJ had nothing to go on but "bare medical facts" – a diagnosis of heart disease with angina and improvement after surgery. There was no indication in the record as to the "impact of [the] heart condition." *Lugo v. Secretary of Health and Human Services*, 794 F.2d 14, 15 (1st Cir. 1986). Here, the record does include evidence regarding the physical impact of Ms. Spencer's condition, but that evidence suggests such impact is not significant.

was no mention of memory problems and scant mention of dizziness. Two of three tests evaluating her memory – including one by her treating physician – demonstrated her memory was intact. Now, her memory may not be perfect – indeed, even the ALJ accepted that it was limited – but that just means that she can no longer perform the level of work she was used to. She is left with a capacity for simpler tasks. Given these problems, the vocational expert still identified jobs she could perform that exist in significant numbers in the regional economy. These may not be as challenging or rewarding as the work Ms. Spencer once did, but that fact does not qualify her for disability benefits.

## CONCLUSION

The plaintiff's motion for summary judgment or remand is DENIED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 3/2/11